Lisa **KASSEN, R.N., Dallas County Hospital District d/b/a Parkland Memorial Hospital, Gurjeet S. Kalra, M.D., and The University of Texas Southwestern Medical Center at Dallas, Petitioners,**

v.

**Judy HATLEY and William Johnson, Respondents.**

**No. D–4248.**

Supreme Court of Texas.

Argued May 5, 1994.

Decided Nov. 10, 1994.

Rehearing Overruled Dec. 22, 1994.

---

Richard Bernays, Thomas L. Cox, Dallas, Donna M. Aversano, James Ldlum, Jr., Anthony G. Brocato, Jr., Dan Morales, Austin, for petitioners.

John Horany, James E. Girards, David R. Weiner, Dallas, for respondents.

GONZALEZ, Justice, delivered the opinion of the Court, in which HIGHTOWER, HECHT, CORNYN and SPECTOR, Justices, join.

In this case we decide whether a doctor and nurse employed by a governmental entity were entitled to the defense of official immunity when sued individually for medical malpractice. We conclude that official immunity is a question of fact that was not conclusively established. We thus affirm that part of the judgment of the court of appeals which reversed summary judgment for the doctor and nurse, 859 S.W.2d 367, and remand their causes to the trial court for further proceed-

ings consistent with this opinion. We also conclude that the plaintiffs failed to allege an injury arising from a condition or use of tangible personal property. We therefore reverse the judgment of the court of appeals as to the Dallas County Hospital District d/b/a Parkland Memorial Hospital (Parkland) and the University of Texas Southwestern Medical Center at Dallas (Southwestern), and affirm the judgment of the trial court as to these defendants.

## I. Facts

This wrongful death action arose from the suicide of Ms. Pennie Johnson on February 14, 1988. Johnson, then 24, had been a chronic mental health patient for nearly ten years. Johnson's condition, diagnosed as a borderline antisocial personality disorder, was manifested by depression, pseudo seizures, attacks on others, temper tantrums, manipulative behavior, drug and alcohol abuse, and suicidal threats and gestures. Although she had spent much of her teenage and adult life in institutions, her doctors had decided that long-term institutionalization was not therapeutic. They were treating her as an outpatient at the forensic unit of the Dallas County Mental Health and Mental Retardation System (Dallas County MHMR).

Shortly before midnight on February 13, 1988, a police officer discovered Johnson walking along a Dallas expressway. Because she was threatening to harm herself, the officer took her to the psychiatric emergency room at Parkland. This was her second visit to Parkland in two days. Complaining of depression, Johnson informed a Parkland nurse that she had taken the medication in her possession seven times that day, exceeding the prescribed dosage. After medical staff witnessed her taking additional pills, they confiscated Johnson's medication and placed it in the nurses' station.

Dr. Gurjeet S. Kalra examined Johnson. At the time, he was a third-year resident in psychiatry at Southwestern, serving a rotation in Parkland's psychiatric ward. Parkland had a "difficult patient file" on Johnson

because she had been a patient at Parkland and several other institutions before. This file recommended that staff refer Johnson to Dallas County MHMR rather than admit her when she presented herself to an institution, unless she had significantly different symptoms from those in the past. Kalra found Johnson's conduct consistent with her past behavior, and did not admit her for inpatient care.

Johnson became angry. She demanded the return of her medication and threatened to throw herself in front of a car if she did not receive the pills. Kalra and Lisa Kassen, R.N., the charge nurse in the Parkland emergency room, jointly decided not to return the medicine even though doctors not associated with Parkland or Southwestern had prescribed it. Kassen then told Johnson that she would return the pills if Johnson accepted a taxi ride home at Parkland's expense. Johnson refused, stating that she did not want to go home. Someone called a security officer to escort her out, but Johnson voluntarily left the hospital alone without her medication. Johnson committed suicide a short time later by stepping into freeway traffic.

Johnson's parents, Judy Hatley and William Johnson, filed this wrongful death action against Kalra, Kassen, Parkland, and Southwestern, alleging that the defendants negligently caused their daughter's death.[1] Each of these defendants moved for summary judgment. Parkland and Southwestern argued that the plaintiffs failed to allege a use of tangible personal property as required under the Texas Tort Claims Act. Kalra relied on the defense of official immunity. Kassen argued she was not liable because Section 93.001(a)(2) of the Texas Civil Practice and Remedies Code provides an affirmative defense in cases of suicide.

The trial court granted summary judgment for Southwestern and Kalra without specifying the grounds. The case proceeded to trial against Parkland and Kassen. After the plaintiffs presented their case in chief, Parkland and Kassen moved for directed verdicts.

1. The plaintiffs settled their claim against Dallas County MHMR. It and two other defendants are not parties to this appeal.

Parkland again relied on sovereign immunity. Kassen for the first time asserted official immunity as a defense. The trial court granted the directed verdicts and rendered judgment that the plaintiffs take nothing.

The court of appeals reversed. It held: (1) Kalra and Kassen were not entitled to official immunity because they did not exercise "governmental" discretion, and (2) the plaintiffs had stated a claim under the Texas Tort Claims Act against Parkland and Southwestern by alleging misuse of Johnson's medical records and her medication. The court also stated that summary judgment based on the affirmative defense of suicide, TEX.CIV.PRAC. & REM.CODE § 93.001(a)(2), would have been improper because the evidence did not establish that Johnson's conduct, apart from the conduct of Kalra or Kassen, was the sole cause of her death. All defendants filed applications for writ of error with this Court.

## II. Official Immunity

### A

■ We first determine whether Kalra and Kassen were entitled to the defense of official immunity. This common law defense protects government officers from personal liability in performing discretionary duties in good faith within the scope of their authority. *City of Lancaster v. Chambers,* 883 S.W.2d 650, 653–54 (Tex.1994) (citing *Campbell v. Jones,* 153 Tex. 101, 264 S.W.2d 425, 427 (1954)); *Carpenter v. Barner,* 797 S.W.2d 99, 101 (Tex.App.—Waco 1990, writ denied); *Russell v. Texas Dep't of Human Resources,* 746 S.W.2d 510, 513 (Tex.App.—Texarkana 1988, writ denied); *see Baker v. Story,* 621 S.W.2d 639, 644 (Tex.Civ.App.—San Antonio 1981, writ ref'd n.r.e.). We distinguish official immunity, which protects individual officials from liability, from sovereign immunity, which protects governmental entities from liability. *See Baker,* 621 S.W.2d at 643. If a plaintiff has a right of action against the government due to the state's waiver of sov-

ereign immunity, this right is not affected by whether a government employee has official immunity. *See* TEX.CIV.PRAC. & REM.CODE §§ 104.008, 108.002, 108.003; *Washington v. City of Houston,* 874 S.W.2d 791, 796 (Tex. App.—Texarkana 1994, no writ).

■ The purpose of official immunity is to insulate the functioning of government from the harassment of litigation, not to protect erring officials. *Westfall v. Erwin,* 484 U.S. 292, 295, 108 S.Ct. 580, 583, 98 L.Ed.2d 619 (1988). The public would suffer if government officers, who must exercise judgment and discretion in their jobs, were subject to civil lawsuits that second-guessed their decisions. *See* RESTATEMENT (SECOND) OF TORTS § 895D cmt. b; CHARLES H. KOCH, JR., ADMINISTRATIVE LAW AND PRACTICE § 10.71 (1985). Official immunity increases the efficiency of employees because they need not spend time defending frivolous charges. *Id.* As the United States Supreme Court has noted, official immunity is important:

> [O]fficials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government.

*Barr v. Matteo,* 360 U.S. 564, 571, 79 S.Ct. 1335, 1339, 3 L.Ed.2d 1434 (1959).

### B

■ On the ground of official immunity, Kalra prevailed on his motion for summary judgment and Kassen prevailed on her motion for directed verdict. For the summary judgment to have been proper, Kalra had to establish conclusively each element of his defense. *See Montgomery v. Kennedy,* 669 S.W.2d 309, 310–11 (Tex.1984).[2] Likewise,

---

2. The following standards guide a trial court in considering a summary judgment motion:

    1. The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

2. In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true.

Kassen had to establish conclusively her official immunity defense. If sufficient evidence was presented at trial, such that "reasonable minds could differ about the fact determination to be made by the jury," then Kalra and Kassen were not entitled to judgment as a matter of law. *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994) (quoting William Powers, Jr. and Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEX.L.REV. 515, 523 (1991)).

■ The elements of the defense of official immunity are (1) the performance of a discretionary function (2) in good faith (3) within the scope of the employee's authority. *City of Lancaster*, 883 S.W.2d at 653. The second and third elements of this defense were undisputed; Kalra and Kassen conclusively established them.[3] The plaintiffs only contend that one issue remains: were Kalra and Kassen performing "discretionary" functions that would entitle them to official immunity?

**C**

■ The primary issue before us is whether Texas distinguishes medical from governmental discretion in applying the doctrine of official immunity to government-employed medical personnel. Ordinarily, official immunity extends to any action or decision by a state employee that is "discretionary." *See City of Lancaster*, 883 S.W.2d at 653–54. Discretionary functions receive protection, but ministerial duties do not. *See id.* This distinction is admittedly problematic. *See Travis v. City of Mesquite*, 830 S.W.2d 94, 102 (Tex.1992) (Cornyn, J., concurring) (citing PROSSER AND KEETON ON THE LAW OF TORTS § 132, at 1062 (W. Page Keeton et al. eds., 5th ed. 1984)). We have explained the distinction as follows:

Ministerial acts are those "[w]here the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment ... but where the act to be done involves the exercise of discretion or judgment, it is not to be deemed merely ministerial".... If an action involves personal deliberation, decision and judgment, it is discretionary; actions which require obedience to orders or the performance of a duty to which the actor has no choice, are ministerial.

*City of Lancaster*, 883 S.W.2d at 654 (citations omitted). However, other courts have noted that most duties involve some measure of discretion, including purely ministerial duties. *See, e.g., Baker*, 621 S.W.2d at 645. Labelling an act as discretionary is "probably only a shorthand notation for a more complex policy decision." PROSSER AND KEETON, *supra* § 132, at 1062.

Medical professionals exercise considerable judgment and discretion in examining a patient, evaluating symptoms, and prescribing treatment. The plaintiffs argue that such actions by government-employed physicians and nurses are only *medical* functions, not *governmental* functions. The plaintiffs thus conclude that Kalra and Kassen were not entitled to immunity, relying upon *Armendarez v. Tarrant County Hosp. Dist.*, 781 S.W.2d 301, 305–06 (Tex.App.—Fort Worth 1989, writ denied).

The plaintiffs in *Armendarez* sued a public hospital and three individual doctors in connection with the birth of their son. The *Armendarez* court ruled that the doctors did not have official immunity, even though they worked for a governmental entity. *Id.* at 306. The court conceded that the doctors

3. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.
*Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985).

**3.** Kalra determined in good faith that Johnson did not meet the criteria for admission to Parkland. He made this decision after he evaluated Johnson and read the recommendation in her difficult patient file not to admit her as an inpatient. The plaintiffs did not controvert this evidence and never argued that Kalra failed to act

in good faith. Similarly, the evidence established that Kassen acted in good faith. Kassen testified that she believed that Johnson's suicide threats were not genuine, and that the only real danger to Johnson was from abuse of her medication. Kassen also offered to return the medication if Johnson would go home in a taxi at Parkland's expense. The plaintiffs did not argue that Kassen failed to act in good faith.

The record established, and the plaintiffs did not challenge, that Kalra and Kassen acted within the scope of their employment.

exercised discretion, but found that their duties were "not uniquely different from those engaged in the same duties in the private sector or where no function unique to government is being exercised." *Id.* The court reasoned that, because official immunity's purpose is to protect "the fearless, vigorous, and effective administration of government," immunity should protect employees only when they are performing governmental functions. *Id.* at 305–06 (quoting *Barr,* 360 U.S. at 571, 79 S.Ct. at 1339); *see Washington,* 874 S.W.2d at 796–97.

■ We find unsatisfactory *Armendarez*'s distinction between activities that are *uniquely* governmental and those that are not. There are few activities that are uniquely governmental. *See Guillory v. Port of Houston Auth.,* 845 S.W.2d 812, 814 (Tex.) (rejecting the view that sovereign immunity only protects a political subdivision's "uniquely governmental" functions), *cert. denied,* ── U.S. ──, 114 S.Ct. 75, 126 L.Ed.2d 43 (1993). The doctrine of official immunity is a near nullity if its protection only extends to government employees exercising "uniquely governmental" functions. *See id.* We conclude that *Armendarez,* which ruled that official immunity protects only "uniquely governmental" discretionary functions, is ambiguous. *Armendarez* does not state the appropriate method for determining if doctors, nurses, or other government employees have official immunity.

However, we must still decide which discretionary acts performed by state-employed medical personnel are entitled to official immunity. Government service imposes constraints and responsibilities on health-care providers that private practitioners do not have. For example, government health care-providers have less latitude in choosing patients than their private-sector counterparts.

*See Henderson v. Bluemink,* 511 F.2d 399, 403 n. 21 (D.C.Cir.1974) (noting that when giving medical care is compulsory, a court may evaluate acts of medical discretion under a different standard of care). Also, state-employed medical personnel often have policy-making or administrative responsibilities not shared by private-sector providers. At times, government doctors and nurses must decide how to allocate a scarce pool of state resources among possible recipients. Because of these circumstances, the good faith performance of governmental responsibilities should not be subject to second-guessing in the courtroom. Such litigation would result in a drain on state resources that are already scarce. It would further discourage qualified individuals from entering medical practice in the public sector. Government medical facilities are already hard-pressed to attract candidates because of government's typically lower salaries than in the private sector.

On the other hand, once a government health-care provider begins to treat a patient, the duty of care owed to the patient is no different from the duty of care owed by any medical professional. If a doctor or nurse does not perform a medical procedure with the level of care and skill of an ordinarily prudent health-care provider, a patient injured as a result should not suffer without compensation for the sole reason that the doctor or nurse is a government employee. *See James v. Jane,* 221 Va. 43, 282 S.E.2d 864, 870 (1980). Courts across the country have adopted three basic strategies to balance these conflicting goals. We believe the third approach is the better approach.

The first group of courts will not extend official immunity to medical treatment by state-employed personnel, because treatment is ministerial in nature and does not involve discretion.[4] We reject this approach because

---

4. *See, e.g., Davis v. Knud–Hansen Memorial Hosp.,* 635 F.2d 179, 186 (3d Cir.1980) (ruling that a government doctor had no immunity from negligence in the course of "essentially ministerial" medical treatment); *Jackson v. Kelly,* 557 F.2d 735, 739 (10th Cir.1977) (concluding that an Air Force physician had no official immunity since prenatal treatment involved no governmental discretion); *Kiersch v. Ogena,* 230 Ill.App.3d 57, 172 Ill.Dec. 335, 340, 595 N.E.2d 696, 701 (finding that a malpractice action against a state-employed doctor was no different than one against any physician), *appeal denied,* 147 Ill.2d 627, 180 Ill.Dec. 150, 606 N.E.2d 1227 (1992); *Watson v. St. Annes Hosp.,* 68 Ill.App.3d 1048, 25 Ill.Dec. 411, 415–16, 386 N.E.2d 885, 889–90 (1979) (recognizing immunity for "discretionary" acts, defining them as acts that are "governmental in character," and thus excluding medical care); *Gould v. O'Bannon,* 770 S.W.2d 220, 222 (Ky.1989) (ruling that university hospital physi-

it curtails official immunity too much. In performing their duties, government-employed medical personnel exercise considerable judgment and deliberation in performing their medical duties. The better approach is to allow claimants to use the common law of malpractice to review medical discretion, but to protect governmental discretion through official immunity. *See Spencer v. General Hosp.*, 425 F.2d 479, 489 (D.C.Cir.1969) (Wright, J., concurring).

The second group of courts holds that government medical personnel are immune from tort liability arising from the exercise of discretion in both governmental and medical decisions.[5] We reject this approach because it applies official immunity too broadly. Such a blanket policy of official immunity does not promote the doctrine's purposes, and denies compensation to malpractice victims. The state's interest in reducing the cost of insuring its medical personnel against malpractice actions does not justify denying patients the right to assert claims for negligent treatment.[6] *See James*, 282 S.E.2d at 870. Furthermore, the exercise of medical discretion does not require the same protection as the exercise of governmental discretion. Without immunity, some government officials might hesitate to take actions for the public's protection that could subject them to individual liability. For example, a police officer might decide not to pursue a suspect. *See Travis*, 830 S.W.2d at 102–03. However, a doctor cannot avoid personal liability through inaction because physicians are under a duty to exercise ordinary care to treat patients. Thus, immunity is not necessary to encourage the careful practice of medicine. *See Henderson*, 511 F.2d at 402–03; *Womble v. Singing River Hosp.*, 618 So.2d 1252, 1263–64 (Miss.1993).

The third group of courts, with which we agree, distinguishes between *governmental* and *medical* discretion. These courts hold that government-employed medical professionals are not immune from tort liability arising from the negligent exercise of medical discretion.[7] We hold that government-employed medical personnel are not immune from tort liability if the character of the discretion they exercise is medical and not governmental. A state-employed doctor or nurse has official immunity from claims arising out of the exercise of governmental discretion, but is not immune from liability arising from the exercise of medical discretion. Courts should look at the character of the discretion exercised in each instance.

cians had no immunity for medical care, a solely ministerial function); *Kelley v. Rossi*, 395 Mass. 659, 481 N.E.2d 1340, 1344 n. 6 (1985) (stating that a physician's emergency room treatment of a child did not involve discretionary functions to confer immunity).

5. *See, e.g., Smith v. Arnold*, 564 So.2d 873, 875–76 (Ala.1990) (holding a psychiatrist immune from liability with regard to the care of a suicidal patient in a state mental health facility); *Canon v. Thumudo*, 430 Mich. 326, 422 N.W.2d 688, 699 (1988) (finding a state-employed psychiatrist immune from liability for his decision not to involuntarily commit a man who later shot his mother).

6. In *Spencer*, Judge Wright remarked:
   ... [T]he bald policy conclusion that "it is better that an individual should sustain an injury than that the public should suffer an inconvenience" runs counter to both the traditional tort principle that *vis-a-vis* the innocent victim the wrongdoer should pay, and modern tort concepts of risk distribution and cost allocation.
   425 F.2d at 487 (quoting *Russell v. Men of Devon*, 100 Eng.Rep. 359, 362 (1788)).

7. *See, e.g., Henderson*, 511 F.2d at 403 & n. 24 (finding that doctors were immune from liability due to decisions in an administrative capacity but not due to strictly medical decisions); *Womble*, 618 So.2d at 1262–65 (referring to the principle that official immunity does not protect the exercise of medical discretion as the majority rule); *Cooper v. Bowers*, 706 S.W.2d 542, 543 (Mo.Ct.App.1986) (concluding that a prison doctor did not have immunity for discontinuing an inmate's medication because the conduct did not "partak[e] of the 'essence of governing'") (citation omitted); *Comley v. Emanuel Lutheran Charity Bd.*, 35 Or.App. 465, 582 P.2d 443, 451–52 (1978) (holding that a doctor, who negligently treated a premature child, was not immune since his treatment decisions did not involve public policy concerns); *Protic v. Castle Co.*, 132 Wis.2d 364, 392 N.W.2d 119, 122 (1986) (ruling that an employee making a psychiatric diagnosis was not immune from liability for negligence, because his decisions did not involve governmental concerns); *Scarpaci v. Milwaukee County*, 96 Wis.2d 663, 292 N.W.2d 816, 827 (1980) (finding no immunity for the medical, as opposed to governmental, discretion used in performing an autopsy).

This approach is not the same as the *Armendarez*'s "uniquely governmental" test which focused on a state employee's function. Official immunity does not turn on whether a health-care employee's discretion was *uniquely* governmental or medical. The focus must remain upon the facts of the individual case and the underlying policies promoted by official immunity. We anticipate difficult cases in which government-employed medical personnel will have duties and responsibilities that coincide with private-sector providers. In such cases, if governmental factors and concerns colored the doctor's or nurse's discretion, policy considerations may still call for official immunity. Such decisions necessarily involve a balancing of individual rights and the public interest.[8]

### D

In the present case, Kalra and Kassen did not admit Johnson to Parkland because her difficult patient file indicated hospitalization was not therapeutic for her. Only on appeal did Kalra and Kassen argue that the need to allocate scarce state hospital resources among potential patients also influenced their decision. Because Kalra's summary judgment motion and Kassen's directed verdict motion did not state that this governmental concern figured in their decision not to admit Johnson, we cannot consider it on appeal. *See Stiles v. Resolution Trust Corp.*, 867 S.W.2d 24, 26 (Tex.1993). If there was no basis for Kalra's and Kassen's decision not to admit Johnson except therapeutic considerations, then their exercise of discretion was medical only, and they were not entitled to official immunity. We conclude that Kassen and Kalra failed to prove conclusively that

they exercised governmental discretion. We affirm that part of the judgment of the court of appeals which reversed the summary judgment for Kalra and the directed verdict for Kassen, and remand for further proceedings on the immunity issue.

### III. Other Defenses

#### A

Kalra and Southwestern contend that summary judgment in their favor was proper under Section 93.001(a)(2) of the Texas Civil Practice and Remedies Code. That section states:

> It is an affirmative defense to a civil action for damages for personal injury or death that the plaintiff, at the time the cause of action arose, was ... committing or attempting to commit suicide, and the plaintiff's conduct in committing or attempting to commit suicide was the sole cause of the damages sustained; provided, however, *if the suicide or attempted suicide was caused in whole or in part by a failure on the part of any defendant to comply with an applicable legal standard,* then such suicide or attempted suicide shall not be a defense.

*Id.* (emphasis added). Kalra and Southwestern had no defense under this section if they failed to comply with the standard of care, and their failure was a cause of Johnson's suicide. To support their motion for summary judgment, Kalra and Southwestern presented the deposition testimony of Dr. Roger Butler, who testified that Kalra met the appropriate standard of care in treating Johnson. The plaintiffs controverted this evidence with the deposition testimony of Dr.

---

8. Official immunity applies to executive officials and to lower level personnel who exercise governmental discretion. *See* RESTATEMENT OF TORTS (SECOND) § 895D cmt. d (1977). We decline to attempt precisely to define when a government employee's acts involve "governmental" discretion, but recommend that courts consider the following factors:
   1. the nature and importance of the function that the employee is performing,
   2. the extent to which passing judgment on the exercise of discretion by the employee will amount to passing judgment on the conduct of a coordinate branch of government or an agency thereof,
   3. the extent to which the imposition of liability would impair the employee's free exercise of discretion,
   4. the extent to which financial responsibility will fall on the employee,
   5. the likelihood that harm will result to the public if the employee acts,
   6. the nature and seriousness of the type of harm that may be produced, and
   7. the availability to the injured party of other remedies and forms of relief.

   *See id.* § 895D cmt. f.

Robert Litman, who concluded that Kalra was negligent in discharging Johnson from the hospital without her medication. The testimony of Butler and Litman raised a genuine issue of material fact on whether Kalra and Southwestern met the applicable legal standard of care. Therefore, summary judgment based on Section 93.001(a)(2) would have been improper. *See Evans v. City of Marlin,* 986 F.2d 104, 109 (5th Cir.1993) (denying defendants summary judgment under TEX.CIV.PRAC. & REM.CODE 93.001 because of the fact question whether a jail inmate's conduct was the sole cause of his suicide).

**B**

■■■ Kalra and Southwestern also argue that summary judgment was appropriate because Johnson's suicide was not foreseeable as a matter of law. However, the defendants' summary judgment evidence did not conclusively negate the plaintiffs' allegation that Kalra was aware of the seriousness of Johnson's suicide threats. (At the trial against the other defendants, Parkland and Kassen, evidence conflicted on whether Johnson's suicide was foreseeable.) Litman testified that a reasonable psychiatrist under similar circumstances should have recognized Johnson's threats as genuine. Consequently, whether her suicide was foreseeable was a genuine issue of material fact that precluded summary judgment.

**C**

■■■ Kalra finally argues that the summary judgment in his favor should be affirmed under Section 101.106 of the Texas Civil Practice and Remedies Code. That section provides:

> A judgment in an action or a settlement of a claim under this chapter [Governmental Liability for Tort Claims] bars any action involving the same subject matter by the claimant against the employee of the gov-

ernmental unit whose act or omission gave rise to the claim.

Kalra says that the record conclusively established that he was an employee of the Dallas County MHMR at the time of Johnson's visit to Parkland and subsequent suicide. Therefore, since Dallas County MHMR settled with the plaintiffs prior to trial, Section 101.106 bars the action against him as a matter of law. However, Kalra did not include this ground in his motion for summary judgment. We thus cannot consider it on appeal. *See Stiles,* 867 S.W.2d at 26.

Upon remand, if Kalra and Kassen properly raise the foregoing defenses, the trial court may consider them along with official immunity.

**IV. Sovereign Immunity**

Parkland and Southwestern are governmental entities entitled to the defense of sovereign immunity. We must determine whether the Texas Tort Claims Act's limited waiver of sovereign immunity allowed the plaintiffs to bring their claim against these petitioners. The Texas Tort Claims Act waives sovereign immunity for:

> personal injury and death ... caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX.CIV.PRAC. & REM.CODE § 101.021(2). The issue is whether Johnson's suicide was caused by a condition or use of tangible personal property such that Parkland and Southwestern would be liable for Johnson's death if they were private persons. The plaintiffs relied on the condition or use of the following property: Johnson's medical records, the difficult patient file, an emergency room procedures manual, and the confiscated medication.[9]

Because Southwestern prevailed on a motion for summary judgment aimed solely at the plaintiffs' pleadings,[10] we look to those

---

9. Plaintiffs' Fifth Amended Petition listed items of tangible property Parkland and Southwestern used. Although the plaintiffs did not include Johnson's medication in the list, they fairly plead a use of the medication elsewhere in the petition. This pleading suffices for them to name the medi-

cation as tangible property in support of their argument under the Texas Tort Claims Act.

10. Southwestern should have pursued this attack by special exception rather than by motion for summary judgment. *See Texas Dep't of Corrections v. Herring,* 513 S.W.2d 6, 9–10 (Tex.1974).

pleadings to determine whether they stated a cause of action under Section 101.021(2). As for Parkland, which prevailed on a motion for directed verdict, we must determine whether the plaintiffs presented some evidence supporting their claim. Since the evidence at trial corresponded with the allegations plead by the plaintiffs, the inquiry is the same for both defendants concerning the condition or use of property.

We recently held that information in medical records is not tangible personal property within the meaning of the Texas Tort Claims Act. *University of Texas Medical Branch v. York,* 871 S.W.2d 175, 176 (Tex.1994). In *York,* we concluded that the state did not waive its sovereign immunity by using, misusing, or not using information in a medical record. *Id.* The reasoning of *York* extends to Johnson's medical records, the difficult patient file, and the emergency room procedures manual. Use, misuse, or non-use of these items by agents of Parkland and Southwestern did not support a claim under the Texas Tort Claims Act.

Regarding Johnson's medication, we also conclude that the plaintiffs did not state a cause of action under the Texas Tort Claims Act. The plaintiffs did not claim that a condition of the medication caused Johnson's death, but that use of the prescription drugs caused her death. They point to Parkland's and Southwestern's agents allowing Johnson to leave the hospital without returning the medication as the "use" of tangible personal property that caused her suicide.

We have never held that a non-use of property can support a claim under the Texas Tort Claims Act. Section 101.021, which requires the property's condition or use to cause the injury, does not support this interpretation. *See LeLeaux v. Hamshire–Fannett Indep. Sch. Dist.,* 835 S.W.2d 49, 51 (Tex.1992) (stating that "use" means "to put or bring into action or service; to employ for or apply to a given purpose") (quoting *Mount Pleasant Indep. Sch. Dist. v. Estate of Lindburg,* 766 S.W.2d 208, 211 (Tex.1989)). We

conclude that the non-use of available drugs during emergency medical treatment is not a use of tangible personal property that triggers waiver of sovereign immunity. *See Floyd v. Willacy County Hosp. Dist.,* 706 S.W.2d 731, 732–33 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.).

In this case, the plaintiffs claim that Kalra's and Kassen's failure to provide the medication when Johnson left the hospital caused her to commit suicide. This sequence of events does not allege an injury arising from the "use" of the medication. It states a claim for non-use of property that does not trigger waiver of sovereign immunity under the Texas Tort Claims Act. *Compare with Quinn v. Memorial Medical Ctr.,* 764 S.W.2d 915, 917 (Tex.App.—Corpus Christi 1989, no writ) (finding a hospital pharmacy's dispensing of a drug a use of tangible personal property within the Texas Tort Claims Act). Accordingly, we hold that Parkland and Southwestern were entitled to prevail on their defense of sovereign immunity.

For the foregoing reasons, we affirm that part of the court of appeals' judgment which reversed the summary judgment for Kalra and the directed verdict for Kassen, and remand their causes to the trial court for further proceedings consistent with this opinion. We reverse the judgment of the court of appeals as to Southwestern and Parkland, and affirm the judgment of the trial court as to these defendants.

PHILLIPS, C.J., joins in Parts I, II, and III of the Court's opinion.

GAMMAGE, J., joins in Parts I and III of the Court's opinion.

ENOCH, J., not sitting.

PHILLIPS, Chief Justice, concurs and dissents.

I join in parts I, II, and III of the Court's opinion. Because Dr. Kalra and Nurse Kassen did not establish that they exercised

However, because the plaintiffs did not present an objection to the trial court or request an opportunity to amend their petition in the wake of the summary judgment, they waived any com-

plaint. *See San Jacinto River Auth. v. Duke,* 783 S.W.2d 209, 210 (Tex.1990) (citing Tex.R.App.P. 52(a)).

governmental discretion in their treatment of Pennie Johnson, I agree that the claims against them should be remanded for further proceedings. I do not join, however, in part IV of the Court's opinion. I believe that respondents alleged an injury arising from use of tangible personal property by Parkland Hospital and Southwestern Medical Center. I would therefore also remand the claims against those defendants for further proceedings.

I agree with the Court that plaintiffs have not stated a claim of misuse of tangible personal property under the Tort Claims Act regarding either Pennie Johnson's medical records, the difficult patient file or the emergency room procedures manual. *See University of Texas Medical Branch at Galveston v. York*, 871 S.W.2d 175 (Tex.1994). I conclude, however, that plaintiffs' allegations relating to Johnson's medication do state such a claim.

There can be little doubt that prescription drugs are tangible personal property. Although not statutorily defined, "tangible personal property refers to something that has a corporeal, concrete, and palpable existence." *York*, 871 S.W.2d at 178. Unlike medical records, which are useful because they memorialize intangible information, the utility of a prescription drug is in the physical properties of the drug itself.

I further conclude that plaintiffs adequately pled a use of Johnson's medication, causing injury, by their allegation that Parkland's and Southwestern's agents negligently allowed Johnson to leave the hospital without returning her previously confiscated medication. I agree with the Court that a "nonuse" of property is insufficient to state a claim under the Tort Claims Act, and that the failure to prescribe or administer a particular drug would not support a waiver of sovereign immunity. This case, however, does not involve the mere failure to provide necessary medicine. Rather it concerns the actual confiscation of medicine, prescribed elsewhere, which Johnson already had in her possession. This states a claim of misuse, not merely nonuse, of the pills. If defendants had really "not used" the medication, it

would have remained in Johnson's possession, not theirs.

Accordingly, I join in the Court's judgment affirming the judgment of the court of appeals as to Kalra and Kassen. Because I would also affirm the judgment of the court of appeals as to Parkland Hospital and Southwestern Medical Center, I dissent from the remainder of the Court's judgment.

GAMMAGE, Justice, concurs and dissents, joined by DOGGETT, Justice.

I concur in the judgment of the court to the extent it remands to the trial court the cause involving the doctor and nurse. I concur with the majority opinion that official immunity was not established as a matter of law, though I disagree with the standard the court adopts. In my view, if non-governmental discretion is involved in the decision at all, the employee should not be able to claim official immunity.

I further agree that the special suicide defense is not established as a matter of law, TEX.CIV.PRAC. & REM.CODE § 93.001(a)(1), (2), and with the conclusion that other special defenses were not raised or established as a matter of law.

I join in Chief Justice Phillips' conclusion in his concurring and dissenting opinion that confiscation of medication is a use of tangible property. I am incredulous that the majority call it a "non-use" of tangible physical property to *confiscate* medication prescribed by other physicians from the owner for whom it was prescribed, and then knowingly and consciously *withhold* it from her. As the majority even admits, there was expert medical testimony that it was negligent to discharge Johnson from the hospital without her medication, and such action could have proximately caused her death.

Although "use" of the medication is all we really must address to conclude the Tort Claims Act applies in this case, I believe the dissenting portion of Chief Justice Phillips' opinion falls short in two instances. First, although I understand we are now bound by *York* and what I view as its erroneous holding, I still believe the use of Johnson's medical records and difficult patient file do state a

claim for misuse of tangible personal property. *University of Texas Medical Branch v. York,* 871 S.W.2d 175, 180–81 (Tex.1994) (Gammage, J., dissenting). Second, by properly distinguishing *York,* I would hold that a "non-use" of property is *not* in *all* instances insufficient to state a claim under the Tort Claims Act. As I have explained before, the non-use of some item of property necessary to make safe the use of property supplied has properly been held actionable. *Id.* at 181–82. Today's opinion makes reconciling our prior decisions all the more difficult, if not impossible. Because I cannot join in the holding that the Tort Claims Act does not reach these facts, I respectfully dissent.